IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KRIS D. GRAVES,<br><br>Plaintiff<br><br>v.<br><br>CAROLYN COLVIN,<br>*Acting Commissioner of Social Security*<br><br>Defendant | **MEMORANDUM DECISION AND ORDER**<br><br><br>2:14-CV-00459-EJF<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiff Kris D. Graves asks this Court[1] to reverse or remand the final agency decision denying his Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, *see* 42 U.S.C. §§ 401–434.  The Administrative Law Judge ("ALJ") determined that Mr. Graves did not qualify as disabled within the meaning of the Social Security Act.  (ECF No. 8, the certified copy of the transcript of the entire record of the administrative proceedings relating to Kris Graves (hereafter "Tr. __") 20.)  Having carefully considered the parties' memoranda and the complete record in this matter, the Court REMANDS the Commissioner's decision.[2]

## PROCEDURAL HISTORY

In July 2011, Mr. Graves filed for DIB alleging a disability onset date of December 4, 2009.  (Tr. 20.)  The Regional Commissioner declined Mr. Graves's claim on January 11, 2012, and again upon reconsideration on July 20, 2012.  (*Id.*)  At Mr. Graves's request a hearing before an ALJ took place on February 5, 2013 ("the Hearing").  (*Id.*)  On February 22, 2013 the ALJ issued a decision (the "Decision") finding Mr. Graves not disabled as defined in the Social

---

[1] The parties consent to the jurisdiction of a magistrate judge.  (ECF No. 14.)
[2] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the Court concludes it does not need oral argument and will determine the appeal on the basis of the written memoranda.

Security Act.  (Tr. 28.)  Mr. Graves filed a request for review of that Decision.  (*See* tr. 1.)  The Appeals Council denied Mr. Graves's request on May 14, 2014, (tr. 1), making the ALJ's Decision the Commissioner's final decision for purposes of judicial review under 42 U.S.C. § 405(g).  *See* 20 C.F.R. § 404.981.

## FACTUAL BACKGROUND

Mr. Graves, born on August 21, 1973, alleged his chronic pain, back problems, arthritis, migraines, and depression rendered him disabled beginning December 4, 2009.  (Tr. 106-107.)

Mr. Graves has a history of lower back pain beginning at age sixteen.  (Tr. 413.)  Dale Kiker, M.D., a specialist in pain management, began treating Mr. Graves for his pain prior to his alleged disability onset date.  (*Id.*; Pl.'s Reply 2, ECF No. 21.)  Mr. Graves reported ongoing difficulty with chronic back pain, with pain levels ranging from two out of ten with medication to ten out of ten without medication and with certain activities.  (Tr. 413.)  In July 2008, Mr. Graves's medication list included Soma, Vicodin, Diovan, Zantac, and Advair.  (*Id.*)  Mr. Graves also reported using a TENS (transcutaneous electrical nerve stimulation) pain control device that he continued to use through the date of decision.  (Tr. 413, 49.)  Dr. Kiker regularly monitored Mr. Graves's pain medication throughout the course of treatment, modifying it as necessary. (*See*, *e.g.,* tr. 414, 405, 399, 393-94, 384, 372-73, 357-58, 482-83.)  In November 2008, Mr. Graves began reporting thoracic back pain as well.  (Tr. 407.)  A December 2008 MRI showed both a protruding disc and degenerative changes in the lumbar spine.  (Tr. 239.)  In March, 2009, Mr. Graves began using a cane for mobility.  (Tr. 402.)  An August 2009 MRI showed thoracic disc disease and disc protrusion.  (Tr. 398.)  Between May 2009 and February 2011, Dr. Kiker administered at least four epidural injections to relieve Mr. Graves's pain.  (Tr. 326, 331, 336, 341.)  The injections had inconsistent and limited success in relieving Mr. Graves's pain.  (Tr.

399 (no relief), 390 (some help).)  Twenty-five days after Mr. Graves's alleged disability onset date, Dr. Marc D. Wolfsohn, M.D. examined Mr. Graves and asserted that movie theater management was "probably suitable for this patient" but warned against any "physically related" work.  (Tr. 395.)  By January 28, 2010 Mr. Graves had left his job.  (Tr. 393, 22.)

In May 2010 Mr. Graves reported walking about two miles daily with increasing hip pain in an effort to achieve weight loss, as recommend by Dr. Kiker.  (Tr. 386.)  At that visit, Mr. Graves reported a pain level of five out of ten.  (*Id.*)  In June 2010, Mr. Graves reported a pain level of four out of ten. (Tr. 384.)  By September 2010, Mr. Graves experienced "unremitting and quite severe [pain] requiring him to lie down," reportedly a seven to eight out of ten; he reported trying to return to work; Dr. Kiker noted that "it may be difficult to impossible to do the type of work, especially if it entails being on his feet for any significant amount of time."  (Tr. 380.)  In a December 23, 2010 letter, Dr. Kiker asserted Mr. Graves experiences "severe pain, especially with ambulating and doing any kind of activities."  (Tr. 374.)  By that point Mr. Graves had lost sixty pounds, and but reported a pain level of eight.  (Tr. 375.)  In January 2011, Mr. Graves reported he continued to search for work despite severe pain, six out of ten.  (*See* tr. 372, 374.)

Dr. Triese Chesnut, M.D. is Mr. Graves's primary care provider.  (Tr. 22.)  Between August 2010 and January 2011, Dr. Chesnut's records do not indicate Mr. Graves reported any back pain or limited range of motion.  (Tr. 22, 252–63.)  The records do indicate lumbar issues without any specificity.  (*See, e.g.* tr. 252, 255, 258.)  Dr. Chesnut also observed "no unusual anxiety or evidence of depression."  (*See, e.g.* tr. 253, 262.)

Mr. Graves did not secure employment and wore a thoracic brace at Dr. Kiker's urging. (Tr. 355, 374.)  An MRI taken in May 2011 showed "mild-to-moderate degenerative changes" in

Mr. Graves's mid-back and various protruding discs in the mid and low back.  (Tr. 276-279.) Mr. Graves's pain levels fluctuated in the following months.  (*See* tr. 360 (5/10), 359, 357 (4-5/10), 355 (6/10).)  In October 2011, Mr. Graves had another MRI to determine the source of his headaches along with his "increasing pain and weakness and feeling swelling in his hands."  (Tr. 421-22; 491.)  The image revealed cervical spinal stenosis, cervical thecal sac compression, disc protrusion, osteophytes, and C7 nerve root compression.  (Tr. 421-22.)  In October 2011, Mr. Graves described his pain as a seven.  (Tr. 489.)

In November 2011, Mr. Graves experienced pain at the eight out of ten level, and Dr. Kiker and expressed concern about the large doses of opiates prescribed and suggested alterations to avoid opiate-induced hyperalgesia.  (Tr. 487.)  That same month James Chan, M.D., a neurosurgeon, determined Mr. Graves had normal range of motion, sensation, and reflexes and did not deem Mr. Graves a candidate for surgery.  (Tr. 468–69.)  Dr. Kiker's December 2011 medical source statement asserts Mr. Graves can only lift less than ten pounds occasionally; stand or walk fewer than two hours, and sit under one hour in an eight-hour workday; and occasionally reach but never handle with his fingers.  (Tr. 427–28.)  This month, Mr. Graves reported his pain between five and seven out of ten.  (Tr. 484.)  In January 2012, Dr. Kiker noted Mr. Graves's medical conditions render him "not employable," and Mr. Graves reported pain at ten out of ten.  (Tr. 482.)  In March 2012, Mr. Graves went to the emergency room complaining of lower back pain and numbness.  (Tr. 460.)  The physician discharged Mr. Graves after a physical exam revealed only muscle spasms and soft tissue tenderness.  (Tr. 461–62.)  The last time Mr. Graves saw Dr. Kiker, Dr. Kiker noted that Mr. Graves had experienced severe pain that month, could only get his pain level down to five sometimes, and could only do some of his activities of daily living.  (Tr. 477.)  Because of the increased pain, Dr. Kiker added

a Medrol pack and suggested an intrathecal pump for the future if Mr. Graves did not qualify for surgery, given "his diffuse spine disease." (Tr. 477-478.)

Dr. Kiker had, at times, addressed Mr. Graves's mental health by prescribing medication to address Mr. Graves's "depression issues." (*E.g.*, tr. 364.) In October 2011, Thaworn Rathana-Nakintara, M.D., a physiatrist, evaluated Mr. Graves at the agency's request. (Tr. 415–19.) Dr. Rathana-Nakintara noted Mr. Graves "has no complaint about any particular mental symptoms except that he has a hard time coping with the ache and pain of his spine due to degenerative disease." (Tr. 415.) Mr. Graves stated his anti-depressant has helped his mood. *Id.* Dr. Rathana-Nakintara reported Mr. Graves scored seventy out of one hundred on the Global Assessment of Functioning (GAF) and diagnosed him with an adjustment disorder. (Tr. 417–18.) Dr. Rathana-Nakintara further asserted Mr. Graves "would be able to handle the usual stresses, changes and demands of gainful employment." (Tr. 418.) In July 2012, Mr. Graves began seeing by Jason A. Winston, M.D., a psychiatrist, who evaluated him and found he had GAF of fifty and increased the dosage of his anti-depressant. (Tr. 516–18.)

In December 2011 and June 2012, State agency physicians A. Pan, M.D. and H.M. Enstrin, respectively, reviewed Mr. Graves's record and asserted Mr. Graves remains capable of performing sedentary work. (Tr. 91-105, 107-123.) In February 2013, at the Hearing, Mr. Graves testified his pain ranges from levels as high as ten out of ten without medication and up to seven out of ten with medication. (Tr. 25.) Mr. Graves testified that he cannot drive, that he struggles to concentrate or count money, and that his pain renders him unable to work. (Tr. 36–37, 39–42.) Mr. Graves further testified he experiences nerve pain and numbness in his right hand and leg, (tr. 41), and that he spends most of his day lying down, (tr. 44–45), and that he can only lift five pounds, (tr. 46).

## STANDARD OF REVIEW

42 U.S.C. §§ 405(g) provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA").  The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards.  42 U.S.C. §405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  The Commissioner's findings shall stand if supported by substantial evidence.  42 U.S.C. §§ 405(g).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly contradicted by other evidence."  *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).[3]  The standard "requires more than a scintilla, but less than a preponderance."  *Lax*, 489 F.3d at 1084.  "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion."  *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotations marks and citations omitted).  Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence."  *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's."  *Lax*, 489 F.3d at 1084 (internal quotation marks and citations omitted).  The court will "review only the

---

[3] Courts apply the same analysis in determining disability under Title II and Title XVI. *See House v. Astrue*, 500 F.3d 741, 742 n.2 (8th Cir. 2007).

*sufficiency* of the evidence." *Oldham v. Astrue,* 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). The court does not have to accept the Commissioner's findings mechanically, but "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Lax*, 489 F.3d at 1084 (*quoting Zoltanksi v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson v. Sullivan*; 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## ANALYSIS

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation. *See* 20 C.F.R. §§ 404.1520, 416.920; *Williams v. Bowen*, 844 F.2d 748, 750-53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;
(4) The impairment prevents the claimant from performing his or her past work; and
(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520, 416.920. The claimant has the initial burden of establishing the disability in the first four steps. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). At step five, the burden shifts to the Commissioner to show that the claimant retains the ability to perform other work existing in the national economy. *Id.*

The ALJ evaluated Mr. Graves's claim through step five, making the following findings of fact and conclusions of law with respect to Mr. Graves:

> 1. "[Mr. Graves] meets the insured status requirements of the Social Security Act through December 31, 2014." (Tr. 22.)
> 2. "[Mr. Graves] has not engaged in substantial gainful activity since December 4, 2009, the alleged onset date (20 CFR 404.1571 et seq.)." (*Id.*)
> 3. "[Mr. Graves] has the following severe impairments: cervical, lumbar, and thoracic degenerative disc disease; asthma; and headaches (20 CFR 404.1520(c))." (*Id.*)
> 4. "[Mr. Graves] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (Tr. 24.)

5. "[Mr. Graves] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: requires a cane when walking; and avoid concentrated exposure to dust, fumes, and respiratory irritants." (Tr. 24.)
6. "[Mr. Graves] is unable to perform any past relevant work (20 CFR 404.1565)." (Tr. 26.)
7. "[Mr. Graves] was born on August 21, 1973 and was 36 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563)." (Tr. 27.)
8. "[Mr. Graves] has at least a high school education and is able to communicate in English (20 CFR 404.1564)." (*Id.*)
9. "[Mr. Graves] has acquired work skills from past relevant work (20 CFR 404.1568)." (*Id.*)
10. "Considering [Mr. Graves's] age, education, work experience, and residual functional capacity, [Mr. Graves] has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d))." (*Id.*)
11. "[Mr. Graves] has not been under a disability, as defined in the Social Security Act, from December 4, 2009, through the date of this decision (20 CFR 404.1520(g))." (Tr. 28.)

In short, the ALJ concluded that Mr. Graves, although not capable of performing his past work as a movie theater manager, does not possess an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ further determined that Mr. Graves has the residual functional capacity ("RFC") to perform work in an occupation with jobs existing in significant numbers in the national economy.

In support of his claim that the Commissioner erred by declining to find Mr. Graves disabled, Mr. Graves alleges three points of error: the ALJ's assessment of the treating physician's opinion, the evaluation of Mr. Graves's credibility, and the ALJ's failure to include Mr. Graves's upper-body limitations in the RFC determination. (Pl.'s Br. 2, 10–11, ECF No. 17.)

### I. Evaluation of Treating Physician Medical Evidence

Mr. Graves argues the ALJ erred by failing to provide reasons, supported by substantial evidence, for according little weight to the opinion of his treating medical provider Dr. Kiker. (Pl.'s Br. 7–10, ECF No. 17.)  The Court agrees.

If the ALJ finds a treating physician's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence in [the] case record," the ALJ must give the opinion controlling weight.  20 C.F.R. §§ 404.1527(c)(2).  When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider certain factors.  20 C.F.R. §§ 404.1527(c) provides these factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (citation omitted).  To reject a medical opinion, the ALJ must provide "'specific, legitimate reasons.'"  *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (quoting *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996)).  The ALJ's decision need not discuss explicitly all of the factors for each of the medical opinions.  *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that a lack of discussion of each factor does not prevent the court from according the decision meaningful review).

Here, the ALJ did not accord controlling weight to Mr. Graves's treating medical provider's opinion.  Instead, the ALJ's decision provided specific reasons for granting "little weight" to Dr. Kiker's opinion.  (Tr. 26.)  The ALJ noted Dr. Kiker's assessment of Mr.

Graves's condition contradicts Dr. Kiker's "treatment records show[ing] that [Mr. Graves] was well maintained on medications." (*Id.*) The ALJ further stated "the records do not reveal the types of complaints that would be expected given the extreme limitations provided" by Dr. Kiker's opinions. (*Id.*) The ALJ does not elaborate on what complaints he would expect. The ALJ also determined Dr. Kiker's attempts to reduce the dosage of Mr. Graves's pain medication "suggest[] that [Dr. Kiker] found [Mr. Graves's] opiate usage inconsistent with [Mr. Graves's] level of pain." (*Id.*) Additionally, prior to assigning weight to Dr. Kiker's opinion the ALJ reviewed Dr. Kiker's medical records and found he closely monitored Mr. Graves's pain medication, which enabled Mr. Graves to walk two miles a day and look for work through 2010 and 2011. (Tr. 22-23.)

While the ALJ's analysis satisfies *Watkins*'s requirement of providing an explanation of why he discounted Dr. Kiker's opinion, substantial evidence does not support the opinion. Dr. Kiker's records show a progression of back problems, starting with lumbar pain, continuing to thoracic, and eventually including cervical. Dr. Kiker continually modified Mr. Graves's medications to try to address the pain with only temporary success. Dr. Kiker's records show Mr. Graves's pain as increasing, as opposed to controlled. While Mr. Graves did walk two miles a day through March 2011, nothing suggests he continued walking at that level after that time. Without further explanation as to what complaints Mr. Graves "should" have, the Court cannot evaluate that portion of the ALJ's opinion. While the Commissioner suggests inconsistency with other physician's opinions, the ALJ never gave that reason as a basis to discount Dr. Kiker's opinion. The Court may not supply possible reasons for assigning the weight the ALJ did and may only evaluate the ALJ's decision on the stated reasons. *Robinson v. Barnhart*, 366 F.3d 1078, 1084-85 (10th Cir. 2004). Lastly, Dr. Kiker opined that Mr. Graves should cut back on his

oxycodone because he had "increasing pain." (Tr. 487.) Dr. Kiker explained his suggestion regarding the change came from a concern for "opioid induced hyperalgesia" not from a concern that Mr. Graves did not have significant pain. (Tr. 487.) Dr. Kiker's records do not provide substantial evidence to support the ALJ's findings.

Because substantial evidence does not support the ALJ's basis for according little weight to Dr. Kiker's opinion, this Court remands for further consideration.

## **CONCLUSION**

Based on the foregoing, the Court finds that substantial evidence does not support the ALJ's decision and REMANDS the Decision for further consideration. The ALJ's misreading of Dr. Kiker's records may have significantly impacted other aspects of her decision. Therefore, the Court sees no value in addressing the other points of error raised.

DATED this 22nd Day of September 2015.

BY THE COURT:

_____
Evelyn J. Furse
United States Magistrate Judge